# IN THE SUPREME COURT OF IOWA

No. 11–0435

Filed January 6, 2012

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Appellee,

vs.

**MATTHEW M. BOLES,**

Appellant.

---

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Attorney appeals from the report of the Grievance Commission of the Supreme Court of Iowa proceeding which recommended a sixty-day suspension from the practice of law. **LICENSE SUSPENDED.**

Alfredo G. Parrish of Parrish Kruidenier Dunn Boles Gribble Parrish Gentry & Fisher, L.L.P., Des Moines, for appellant.

Charles L. Harrington and Wendell J. Harms, Des Moines, for appellee.

**WATERMAN, Justice.**

The Iowa Supreme Court Attorney Disciplinary Board brought a complaint against Matthew M. Boles alleging he violated the Iowa Rules of Professional Conduct and the Iowa Code of Professional Responsibility for Lawyers while working on five criminal felony defense matters. A division of the Grievance Commission of the Supreme Court of Iowa determined Boles violated certain rules, primarily related to fee charges, trust fund withdrawals, and client refunds. Boles stipulates to violating rules governing fee withdrawals and accounting procedures, but appeals the commission's determination he neglected an incarcerated client's postconviction relief case, charged several other clients unreasonable fees, failed to promptly return unearned fees, and failed to separate disputed client property. The commission recommended we suspend Boles' license for sixty days. On our de novo review, we find Boles violated seven rules and suspend him from the practice of law for thirty days.

## I. Scope of Review.

"We review attorney disciplinary proceedings de novo." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dunahoo*, 799 N.W.2d 524, 528 (Iowa 2011) (citation and internal quotation marks omitted). We give the commission's findings respectful consideration, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schmidt*, 796 N.W.2d 33, 36 (Iowa 2011). "The board must establish attorney misconduct by a convincing preponderance of the evidence." *Dunahoo*, 799 N.W.2d at 528. If we find the Board established attorney misconduct, we can impose a more or less severe sanction than the commission's recommended sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wagner*, 768 N.W.2d 279, 282 (Iowa 2009).

## II. Findings of Fact.

The commission conducted an evidentiary hearing on January 10, 2011. Each party admitted exhibits without objection. Boles and his wife testified. The parties stipulated to the facts for each of the Board's five counts. A stipulation of facts is binding on the parties. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gailey*, 790 N.W.2d 801, 803 (Iowa 2010). Based upon our de novo review of this record, we find the following facts.

Boles has been a licensed attorney in Iowa since 1993. His practice consists of criminal defense, personal injury, and family law. From 2001 to 2008, the period relevant to this matter, Boles had an extensive, statewide criminal defense practice and regularly handled major felony cases. He drove over 120,000 miles throughout the state while pursuing a challenging and complex trial practice. In the last ten years alone, Boles represented 1105 clients of whom 225 were indigent. Boles has performed extensive court-appointed and pro bono work. He also has compiled an admirable record of public service volunteering to coach more than twenty youth sports teams while serving on nonprofit community boards, mentoring underprivileged children with Waukee schools, and raising his own family. With that background in mind, we will review the facts for each count in turn.

**A. Thomas Smith (Count I).** On February 1, 2001, Boles was appointed to represent Thomas Smith in his postconviction relief action after Smith's previous attorney withdrew from the case because he believed it lacked merit. Smith was serving a twenty-five-year sentence for attempted murder after shooting at a police officer. The district court's appointment order directed Boles to "undertake a review of this file to determine whether or not a postconviction relief action is viable,"

consult with Smith's former attorney and obtain relevant files, and "on at least one occasion have a personal consultation with Mr. Smith."

Shortly after accepting the appointment, Boles contacted the prior attorney for information and documentation. On March 6, Boles wrote Smith about the case. In the letter, Boles said he would "be reviewing [Smith's] file," trying "to set up a phone conference in the very near future" and asked Smith to write him "a letter with [his] thoughts" about the case. Several days later, Boles received a letter stating that Smith is illiterate, that others have to read and write his letters, that Smith would "really like to see [Boles] if [he could]," and that Smith looked forward to hearing from Boles. Boles responded in an April 19 letter, again asking Smith to write his thoughts on the case, and telling Smith, "I would like to come meet with you in the last week of April." Boles, however, did not meet with Smith that spring. In a July 10 letter, Boles again wrote Smith to inform him someone from his office would be meeting with him in the next ten days. That did not happen. Frustrated, Smith sent another letter to Boles on September 15 stating, "I have waited patiently, but no one has come." Several days later, Boles assured Smith by letter he was trying to arrange a phone conference and a visit. On November 6, Boles sent Smith a letter asking him to call his office collect. Smith sent a letter back stating prison rules did not permit him to make collect phone calls.

On January 2, 2002, approximately eleven months after Boles was appointed to the case, Boles and the county attorney agreed to dismiss Smith's case without prejudice to consolidate Smith's multiple postconviction relief actions. On May 7, Boles again wrote Smith to inform him he was trying to schedule a prison visit in the next week. No such meeting occurred. Smith wrote more letters to Boles. On

January 15, 2003, the district court ordered Boles and the prosecutor to meet to discuss the status of Smith's case. Smith wrote Boles on February 8 to inquire about his case, to inform Boles he is Caucasian, not African-American as the previous attorney's postconviction application stated, and to request a visit.

On March 12, Boles filed an application for postconviction relief, verified by Smith. Boles filed this application twenty-five months after being appointed and fourteen months after agreeing to dismiss Smith's prior application. The application contended Smith's conviction and sentence violated constitutional provisions. He first contended that Smith, as an African-American, was denied due process because his jury venire did not contain sufficient African-Americans. Boles also contended Smith's trial counsel erred in failing to have jury selection reported. Smith later testified his illiteracy prevented him from catching the application's erroneous identification that he is African-American.

Smith wrote Boles three times in the spring of 2003 asking Boles to update him on the status of his case; Smith also expressed a desire to give input on the case. Smith's postconviction case did not require expert testimony, nor did Boles believe he needed evidence showing prosecuting attorneys excluded African-Americans from the jury venire.

The trial was set for November 25. In October 2003, Boles visited Smith and discussed the case. Boles requested and received a continuance for the trial on November 21. In 2004, Boles requested and received two more continuances with the consent of the State. The trial date was set for November 23, 2004, nearly forty-six months after Boles was appointed to the case. On the day of trial, Boles again asked for a continuance, but then agreed with the district court the case presented "no factual or evidentiary issues" and decided to submit the case on a

stipulated record consisting of a transcript of Smith's underlying criminal trial and briefs. Boles submitted his trial brief on December 20, 2004. The brief's argument section correctly noted Smith was Caucasian and argued the law accordingly. Boles' efforts were unsuccessful, but the delays caused no harm to Smith who continued serving his sentence. Boles handled the case pro bono.

**B. Robert and Joanne Eide (Count II).** Robert and Joanne Eide are husband and wife. Boles represented Robert in three different legal matters. On September 30, 2003, Robert was charged with second-degree sexual abuse for sexually abusing his granddaughter. In 2004, Boles agreed to represent Robert in the case. Boles received $7750 in advance fee payments. Robert pleaded guilty to third-degree sexual abuse and was sentenced to prison for ten years. While Robert was incarcerated awaiting trial, an inmate assaulted him. Robert discussed with Boles whether to file a civil lawsuit against the State for damages. He also asked Boles to ensure prosecuting authorities brought charges against the assailant. Joanne paid Boles a $5000 retainer for this matter. After an investigation, Boles concluded Robert's prison assault did not create a viable tort claim against the State, and he provided Robert with instructions and paperwork to file a pro se administrative claim. Robert filed his claim pro se, which was ultimately denied in October 2006. In October 2005, relatives filed a civil action against Robert based upon his sexual abuse of his granddaughter. Joanne paid Boles an $18,000 retainer to defend the civil suit. Boles filed a preanswer motion to change venue, which went to a hearing. He also filed an answer and raised affirmative defenses. The case was set for trial, but plaintiffs voluntarily dismissed the case without prejudice in July 2006. Boles did not communicate the results of the civil claim to

Joanne and Robert until October, 4, 2007—a full year after those matters had been resolved.

Boles' trust fund withdrawal and billing records were incomplete in each matter. Over the course of the representation, Boles withdrew all funds paid to him. He did not provide contemporaneous notice, accounting, or billing to the Eides. He withdrew fees before his billing statement indicated the fees were earned. By July 20, 2006, according to his records, he had withdrawn $13,268.60 more than he had earned. On October 4, 2007, Joanne, who had been left in the dark on the status of the cases, contacted Boles' associate to ask about the retainer fees. She learned for the first time the lawsuit had been dismissed. She asked for an itemization of the services and a refund of the remaining balance at that time. Joanne followed up with e-mails and phone calls in late 2007 before Boles wrote her stating he "should have a formal response to [her inquiry] by January 4, 2008." On March 11, 2008, after these proceedings were filed, Boles met with Joanne to discuss the retainer refund. She received a copy of the billings for the first time at this meeting. The bills showed a $445.56 balance for the criminal defense matter, a $12,141.71 credit for the sexual abuse civil matter, and $1590.45 credit for the civil tort suit matter. Boles issued a refund for $13,286.60—seventeen months after the matters were fully concluded and over five months after Joanne had requested a refund and itemization.

After the Board inquiry, Boles and his wife took extensive effort to recreate the billings for these matters. He maintains the Eides in fact were only entitled to a $3602.50 refund.

**C. Joseph Long (Count III).** In 2006, Boles defended Long against charges of eluding while operating intoxicated, vehicular

homicide by operating while intoxicated, leaving the scene of a fatal accident, and third-degree burglary. Boles and Long agreed to a $20,000 flat fee, and Boles received $20,000 paid in advance. According to Boles, his total billings in the case were $27,222.64. Boles asked for, but never received additional payments. In early 2007, Long pled guilty to a series of charges, and the district court sentenced him to a thirty-five-year term of incarceration with no mandatory minimum.

Boles withdrew $20,000 from his trust account over the course of four months. He did not provide Long contemporaneous notice of the withdrawals, billing, or accounting, nor did he provide Long a bill. Boles provided the Board with a bill dated February 2009. According to that bill, Boles withdrew fees from his trust account before they were earned. Boles' recalculated billing still shows he withdrew fees before he earned them.

**D. Donald Bruce Allen (Count IV).** Allen was arrested and charged with first-degree kidnapping, third-degree kidnapping, neglect or abandonment, stalking, and child endangerment on June 21, 2007. Boles began representing him in early July. Allen and his mother paid Boles a $10,000 advance fee on July 10. Boles withdrew the entire fee from the trust account between July 10 and September 21. He did not provide notice, billing, or accounting to Allen for any of the withdrawals. In October 2007, Allen hired a new attorney after rejecting the plea deal Boles presented him. Allen ultimately accepted a nearly identical plea with new counsel.

In late 2007 and early 2008, Allen's mother made three requests for an itemized bill and refund. Boles refunded $1955.14 on February 18, 2008, but never provided the Allens an itemized bill. After

recalculating his bill for this matter, Boles believes he refunded Allen $1677.25 more than Allen was owed.

**E. Manfred Little (Count V).**    From August 2006 to January 2008, Boles defended Little against first-degree kidnapping and willful injury assault charges.    On August 16, 2006, Little's wife, Jane, the alleged kidnapping victim, filed for dissolution of marriage, and the district court issued an order requiring Little to preserve his marital assets.    On August 25, Little paid Boles a $10,000 advance fee, and Boles withdrew $2500 from his trust account on the same day.    Tom Schlapkohl, Jane's divorce attorney, contacted Boles to advise him of the order to preserve assets.    Accordingly, Boles knew Jane claimed an interest in the $10,000 advance fee.    Days later, Boles withdrew $204.42 from his trust account.    Schlapkohl sought to hold Little in contempt for paying Boles with marital assets.    The district court set a hearing for October 19.    Six days before the hearing, Boles withdrew $3000 from the trust account.    At the hearing, the district court ordered "any monies paid and not yet expended as of October 19, 2009 . . . to Matthew Boles . . . by Mr. Little are to be held in the trust account of [his law firm] pending further notice of the Court."    The trust account contained $4295.58.

Boles withdrew from the case on January 16, 2008.    Schlapkohl wrote Boles in April and September about the fee payment.    Boles did not respond in writing.    On September 19, Boles was subpoenaed for a deposition.    Boles did not attend the deposition and, instead, sent his associate.    The district court ordered Boles to pay the money in his trust account to Schlapkohl on November 4, 2008.    Boles issued a check from his trust account the following day for $4295.58.    Boles' recalculated billing shows he was entitled to an additional $3369.10.    Boles failed to

provide Little contemporaneous notice, billing, and accounting for the three trust account withdrawals.

### III. Ethical Violations.

**A. Stipulated Violations.** Boles stipulates to violating several ethical rules. When an attorney stipulates to legal violations, we enforce the stipulation if it is supported by sufficient legal consideration and is not unreasonable, against good morals, or contrary to sound public policy. *Gailey*, 790 N.W.2d at 804; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Knopf*, 793 N.W.2d 525, 528 (Iowa 2011). The commission found sufficient legal consideration to establish Boles' stipulated violations. We agree.

Boles stipulates to violating rules 32:1.15(c) ("fees and expenses . . . to be withdrawn by the lawyer only as fees are earned or expenses incurred") and 45.7(4) (requiring lawyer to notify client of withdrawal and provide complete accounting when removing advance fee from trust account) while representing the Eides, Long, and Allen. Boles concedes he violated rule 45.7(4) while representing Little. He also stipulates to violating rules 32:1.4(a)(3) ("A lawyer shall . . . keep the client reasonably informed about the status of the matter") and 32:1.4(a)(4) ("A lawyer shall . . . promptly comply with reasonable requests for information") in representing the Eides. On our de novo review, we find the stipulated factual concessions and exhibits provide sufficient legal consideration to support these ethical violations.

**B. Contested Commission Legal Conclusions.** Boles appeals several of the commission's determinations. The commission found Boles violated DR 6–101(A)(3)[1] by neglecting Smith's postconviction relief

---

[1]The Iowa Rules of Professional Conduct became effective July 1, 2005, replacing the Iowa Code of Professional Responsibility for Lawyers. The Iowa Code of

application. In representing the Eides and Allen, the commission concluded Boles violated rules 32:1.5(a) ("A lawyer shall not make an agreement for, charge, or collect an unreasonable fee") and 32:1.15(d) ("[A] lawyer shall promptly deliver to the client . . . any funds or other property that the client is entitled to receive"). In representing Little, the commission concluded Boles violated rules 32:1.5(a) (unreasonable fee), 32:1.15(c) (withdraw fees "only as fees are earned"), and 32:1.15(e) ("When . . . a lawyer is in possession of property in which two or more persons . . . claim interest[], the property shall be kept separate"). Boles appeals these determinations.

1. *Neglect.* DR 6–101(A)(3) states a "lawyer shall not . . . [n]eglect a client's legal matter." This rule is construed similarly to Iowa Rule of Professional Conduct 32:1.3 (diligence). *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 915 (Iowa 2011). "[P]rofessional neglect involves 'indifference and a consistent failure to perform those obligations that a lawyer has assumed, or a conscious disregard for the responsibilities a lawyer owes to a client.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Gottschalk*, 729 N.W.2d 812, 817 (Iowa 2007) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Moorman*, 683 N.W.2d 549, 551 (Iowa 2004)). Neglect often arises from procrastination. *Id.*

The commission observed, "Boles made an error of judgment in pursuing this post conviction as it appeared to have little chance of success. However, once Boles chose to undertake this matter he was required to do so diligently." We agree. Smith's postconviction hearing took place almost forty-six months after Boles was appointed to the

---

Professional Responsibility for Lawyers applies to allegations occurring when it was in effect.

matter. During that time, Boles agreed to dismiss the case without prejudice for administrative reasons, waited fourteen months to refile the application, elected not to meet with Smith before refiling the application, incorrectly asserted Smith was an African-American while arguing the jury venire's racial demographics deprived Smith due process, failed to promptly respond to numerous client inquiries, and sought three continuances of the trial date. Smith's application contained purely legal issues, avoiding any need to delay the proceedings for evidentiary investigation. Boles, in fact, agreed to submit Smith's case without evidence. We found an attorney neglected her client's postconviction relief matter by failing "to recast the petition," by failing to "respond to numerous [client] letters," and by submitting the case without evidence after obtaining several continuances. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kennedy*, 684 N.W.2d 256, 258, 260 (Iowa 2004). We agree with the commission's determination that Boles neglected Smith's postconviction relief matter.

2. *Unreasonable fee.* Rule 32:1.5(a) prohibits attorneys from collecting an unreasonable fee and lists eight factors to determine "reasonableness." The record contains insufficient evidence Boles charged or collected objectively unreasonable fees for the services he agreed to render. The Board presented no expert testimony showing Boles' fees were excessive or unreasonable. Boles represented clients charged with serious felonies seeking an attorney with suitable expertise. From all accounts, Boles is experienced and skilled in defending major felony cases. The Board has not established by a convincing preponderance of evidence that Boles charged the Eides, Allen, or Little unreasonable fees. *See Dunahoo*, 799 N.W.2d at 532–33 (finding trust account violations alone did not provide sufficient evidence attorney

charged objectively unreasonable fee).  For the same reasons, we agree with the commission's determination Boles did not violate rule 32:1.5(a) in representing Long.

3. *Failure to promptly refund unearned fees.*  Rule 32:1.15(d) requires "a lawyer [to] promptly deliver to the client . . . any funds . . . the client . . . is entitled to receive."  At issue is whether Boles promptly refunded unearned advanced fees to his clients.  A delay of "several months" violates this rule.  *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Plumb*, 766 N.W.2d 626, 632 (Iowa 2009) (construing former rule DR 9–102(B)(4)).  Boles took seventeen months and ignored numerous refund requests before refunding $13,268.60 to the Eides.  Boles refunded Allen his unearned fees four months after ceasing representation and after Allen's mother made three written refund requests.  Boles' recalculated billing concedes he owed refunds to the Eides and Allen.  We agree with the commission that Boles failed to promptly return fees to the Eides and Allen in violation of rule 32:1.15(d).

4. *Withdrawal of unearned fees.*  Boles contests that he withdrew unearned fees in violation of rule 32:1.15(c) while representing Little.  Boles stipulates to withdrawing fees before earned based upon his May 2008 billing records.  Even Boles' recalculated billing shows he withdrew $526.50 in unearned fees on August 25, 2006.  Accordingly, we agree with the commission's finding that Boles withdrew unearned fees from his client trust account while representing Little in violation of rule 32:1.15(c).

5. *Disputed property.*  Rule 32:1.15(e) requires a lawyer to keep disputed property separate until the dispute is resolved.  This rule

> is perhaps even more critical . . . when the dispute . . . is between *the lawyer* and either a client or a third party . . . .
> In these situations, the lawyer must not take advantage of

physical control of the funds, but must scrupulously abide by . . . protocol.

2 Geoffrey C. Hazard, Jr., et al., *The Law of Lawyering* § 19.7, at 19–14 (3d ed. 2005 Supp.). The Board contends Boles violated the rule by withdrawing fees from his trust account despite knowing Little's wife claimed an interest in the retainer fee through the couple's divorce proceeding. Boles withdrew $204.42 on August 28, 2006—days before he filed an application to release funds in the Littles' marriage dissolution case. Boles then withdrew $3000 on October 13, 2006—six days before a hearing on this dispute. Boles was aware of her competing claim on the funds. Rule 32:1.15(e) expressly commands the lawyer to keep the property separate "until the dispute is resolved." Boles withdrew fees and expenses twice, however, while the dispute was pending. We agree with the commission's finding that Boles violated rule 32:1.15(e).

**C. The Board Failed to Establish Misconduct Violating Other Rules.** The Board alleged Boles' conduct violated rule 32:8.4(c) and (d).[2] The commission found Boles did not violate these rules. Rule 32:8.4(c) states it is professional misconduct to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." The Board contends Boles violated this rule by withdrawing fees before earned and failing to provide clients contemporaneous notice of fee withdrawals. "When an attorney's conduct violates a specific rule involving dishonesty, fraud, deceit, or misrepresentation, we will not find the same conduct to also violate a general rule prohibiting that conduct, such as rule 32:8.4(c)."

---

[2]The Board alleged Boles violated rules DR 1–102(A)(4) and (5) in the Smith matter. We will construe these code of professional responsibility for lawyers rules in the same fashion as the professional conduct rules alleged by the Board. *See Dolezal*, 796 N.W.2d at 915.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 587 (Iowa 2011); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011). We have already found Boles' accounting and refund missteps violated rules 32:1.15(c) and 45.7(4). Further, rule 32:8.4(c) requires a finding of dishonesty, fraud, deceit, or misrepresentation. We have held an attorney only violates this rule if he has "some level of scienter . . . greater than negligence." *Netti*, 797 N.W.2d at 605. From the record presented, we cannot conclude Boles possessed the requisite scienter. Accordingly, we find the Board has failed to prove Boles violated rule 32:8.4(c).

Rule 32:8.4(d) states it is professional misconduct to "engage in conduct that is prejudicial to the administration of justice." Conduct is prejudicial to the administration of justice when it impedes " 'the efficient and proper operation of the courts or of ancillary systems upon which the courts rely.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 768 (Iowa 2010) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Howe*, 706 N.W.2d 360, 373 (Iowa 2005)). While Boles took nearly four years to bring Smith's postconviction relief action to trial, the delays were obtained through court-approved continuances that did not impede the proper operation of the court. Boles' failure to attend a September 19, 2008 deposition about his retainer fee in the Little matter also did not impede the administration of justice. Boles sent his associate who was knowledgeable in the matter. The district court resolved the issue by ordering Boles to pay the remaining retainer to Schlapkohl, which Boles did within a day of the order. We find insufficient evidence that Boles' nonattendance at the deposition violated rule 32:8.4(d).

Finally, the Board alleged Boles, in representing Smith, violated numerous additional provisions of the Iowa Code of Professional Responsibility for Lawyers, including: DR 1–102(A)(1) (conduct that violates a disciplinary rule); DR 1–102(A)(6) (conduct that adversely reflects on the fitness to practice law); DR 6–101(A)(2) (handling a legal matter without adequate preparation); DR 7–101(A)(3) (intentionally prejudicing or damaging a client); DR 7–102(A)(5) (knowingly making a false statement of fact in representing a client); DR 7–102(A)(8) (knowingly engaging in other conduct contrary to a disciplinary rule); and DR 7–106(A) (disregarding or advising a client to disregard a standing rule or ruling of a tribunal). The commission concluded Boles did not violate these rules. We agree. The Board has failed to prove by a convincing preponderance of evidence the scienter required to violate these rules.

**IV. Sanction.**

There is no standard sanction for particular types of misconduct. *Dunahoo*, 799 N.W.2d at 534. While prior cases are instructive, we craft an appropriate sanction in light of each case's unique circumstances. *Id.* In fashioning a sanction

> "we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 61 (Iowa 2009) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008)).

Boles' violations primarily result from his flagrant, multiyear disregard for the billing and accounting requirements of our profession.

He withdrew unearned fees, delayed responding to client requests for accurate billings, and failed to promptly refund unearned fees. Contemporaneous billing requirements provide transparency to help ensure lawyers treat clients honestly and deal fairly with clients purchasing legal services. These record-keeping rules are essential to upholding public confidence in the justice system. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland*, 577 N.W.2d 50, 59 (Iowa 1998) (noting these rules safeguard lawyers from acting unethically and protect the client's interest). Boles' neglect of Smith's postconviction relief action is noted, as is his private admonishment in 2000 for neglecting a postconviction relief case. The focus of our concern is Boles' trust account violations and failure to promptly refund unearned fees. Sloppy billing practices and a stressful trial and travel schedule might explain delays in preparing and sending clients accurate billing statements, but do not justify a lawyer paying himself fees before earning them or failing to properly bill for them. The most egregious example is Boles' handling of the Eides matters. He paid himself $13,260.68 more than he had earned by July 20, 2006, according to his own records at that time, without providing any contemporaneous notice or billing. He failed to issue the refund in that amount until March of 2008, seventeen months after the matters were fully concluded and over five months after the client requested a refund and itemization. Even his subsequent revised accounting showed he had owed the Eides $3602.50.

Sanctions for trust account and accounting violations span from suspensions of several months where the violations were compounded by severe neglect, misrepresentation, or failure to cooperate, *see, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443–44 (Iowa 2007) (four-month suspension for neglect resulting in harm to

clients, failure to return client's property, trust account violations, and prior reprimand); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Frerichs*, 671 N.W.2d 470, 478 (Iowa 2003) (four-month suspension for neglect, an illegal fee accompanied by a trust account violation, failure to provide an accounting, and failure to cooperate); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Adams*, 623 N.W.2d 815, 818–19 (Iowa 2001) (three-month suspension for neglect, failure to deposit a fee into a trust account, failure to account for client property, and misrepresentation to the client in an effort to cover up the neglect), to a public reprimand when the attorney, in an isolated instance, failed to deposit funds into his trust account because he believed the fees to be earned, *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Piazza*, 756 N.W.2d 690, 697, 700 (Iowa 2008).

Recently, we suspended an attorney's license for sixty days for trust account violations. *Parrish*, 801 N.W.2d at 590. There, the attorney repeatedly withdrew unearned fees without contemporaneous notice, maintained poor billing records, and failed to refund the unearned retainer until after his case was submitted to our court. *Id.* at 586–87. We found the attorney disregarded his billing and accounting responsibilities, justifying a two-month suspension. *Id.* at 590. In *Kennedy*, we suspended the attorney sixty days for comparable conduct. 684 N.W.2d at 260. There, the attorney failed to prepare for and advance the interest of her client's postconviction relief action and committed several trust account violations. *Id.* at 260–61. Unlike Boles, she also ignored the Board's investigation. *Id.* at 261.

Boles' trust account problems were not isolated. The Board has shown extensive problems with four clients in this matter. A pattern of misconduct is an aggravating factor. *Parrish*, 801 N.W.2d at 589; *Howe*,

706 N.W.2d at 381. Boles admits his billing and accounting practices in these matters were unsatisfactory. Importantly, however, Boles has corrected his practices to avoid reoccurrence. He has invested in new technologies, employed additional administrative help, and exercised more self-discipline in routinely recording his time. The record contains no evidence Boles has had any trust account problems since 2008. These corrective measures do not absolve his past problems, but are a mitigating factor. *See Parrish*, 801 N.W.2d at 589; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Lickiss*, 786 N.W.2d 860, 871 (Iowa 2010). Importantly also, Boles has cooperated with the Board throughout this process. "We have repeatedly emphasized how important it is for an attorney to cooperate with disciplinary authorities when a complaint has been filed against the attorney." *Kennedy*, 684 N.W.2d at 260. Another significant mitigating factor in this case is Boles' admirable record of volunteer community service to local youth programs and his extensive pro bono practice. Boles' fitness to practice law at this time is unquestioned. We also consider the lack of harm to his clients apart from the delayed refunds. *See Casey*, 761 N.W.2d at 61 (lack of harm is a significant mitigating factor).

After careful consideration of the record, precedent, mitigating factors, and the need to motivate attorneys to maintain proper trust account and billing practices, we conclude a thirty-day suspension is appropriate.

### V. Conclusion.

We suspend Boles' license to practice law in this state with no possibility of reinstatement for thirty days. The suspension applies to all facets of the practice of law, as provided in Iowa Court Rule 35.12(3), and requires notification to clients, as provided by Iowa Court Rule 35.22.

The costs of this proceeding are assessed against Boles pursuant to rule 35.26(1).  Absent an objection by the Board, Boles shall be reinstated after the thirty-day suspension period under the condition that all costs have been paid.  Iowa Ct. R. 35.12(2).

**LICENSE SUSPENDED**.

All justices concur except Wiggins, J., who takes no part.